CAMPEAU GOODSELL SMITH, L.C.
SCOTT L. GOODSELL, #122223
WILLIAM J. HEALY, #146158
440 N. 1st Street, Suite 100
San Jose, California   95112
Telephone:  (408) 295-9555
Facsimile:   (408) 295-6606

ATTORNEYS FOR Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:  ) Case No. 11-60198 SLJ 11
 )
CT DRIVES, LLC, ) CHAPTER 11
 )
                Debtor. )
 ) **THIRD AMENDED DISCLOSURE**
 ) **STATEMENT**

CT Drives, LLC., debtor and Debtor-in-Possession ("CT Drives", "The Company", or "Debtor") submits the following Third Amended Disclosure Statement ("Disclosure Statement").

## INTRODUCTION

This Disclosure Statement is submitted for the purpose of soliciting acceptances to its Debtor's Chapter 11 Plan (as it may be amended or modified hereafter, including, but not limited to, the "Plan") in the within Chapter 11 case, for the reorganization of the Debtor's estate, pursuant to the provisions of Title 11 of the United States Code. This Disclosure Statement is being provided to you, the holders of claims against Debtor (hereinafter "claimants"), to provide you with adequate information to enable you to make informed judgments before exercising your right to vote for or against acceptance of the Plan. This Disclosure Statement was amended following court hearings held on March 1, 2012, April 23, 2012, and May 21, 2012.

As a claimant, your acceptance of the Plan is important. In order for the Plan to be confirmed by the Bankruptcy Court, the holders of two-thirds in amount and more than one-half in number of claims in each Class must vote for acceptance. An acceptance or rejection of the Plan may be voted by completing the accompanying <u>Ballot</u> and returning it to: ***Scott L. Goodsell, Campeau Goodsell Smith, 440 N. First Street, Suite 100, San Jose, CA 95112***.

## **BACKGROUND AND EVENTS LEADING TO PLAN OF REORGANIZATION**

In July 2008, Wayne Higashi, Connard Cali, and Frank Fitz started CT Drives, LLC. The Company was formed to develop and commercialize an "active" pulley to connect alternators to drive belts in engines for cars and trucks. The "active" elements in the pulley design help reduce vibration and noise caused by the high inertia of alternator rotors and the non--uniform speeds of internal combustion engines. The Company has the following patents pending: Cam Damped Pulley for Rotary Devices[1]; Polymer Spring Controlled Pulley Assembly; Elastomeric Spring Cam Polymer Spring Damped Controlled Pulley Assembly for Rotary Devices; Elastomeric Spring Active Pulley Assembly Having a One-way Drive Mechanism; and Dual Layer Elastomeric Spring Active Pulley Assembly. Conntechnical, but not necessarily the Debtor, submits "Debtor's books and records disclose that EPX, Inc., another company controlled by Wayne Higashi, assigned other patents to Debtor at formation including but not limited to US20030188947, US5806643, US6615965, us7513348, and us7818882, and sold additional patents to Debtor on December 24, 2010. At least one of the Company's pulley designs apparently infringes an existing third party patent. At least one of the Company's pulley patents pending was abandoned on April 20, 2012. At least one patent pending related to a polycarbonate polymer spring formulation is being marketed by the Company with no disclosure as to the ownership or any encumbrance as to the technology. These polymer springs are being surreptitiously contract manufactured at a factory in California."

Late in 2008, The Company began assembling products in a facility owned by Automotive Import Manufacturing (AIM), contracted with ROLM to supply the major components of the pulley, in June 2009 ROLM was discontinued, and component manufacturing was transferred to RB&W Manufacturing.

---

[1] Conntechnical submits this patent pending is no longer valid.

In August 2010 CT Drives contends that AIM began manufacturing the CT Drives' pulley under a "temporary" licensing arrangements (allegedly proposed by AIM) and paid a license fee of $3.25 per unit to the company in addition to purchasing springs, a critical pulley component, from The Company. Through February 2011, AIM paid over $90,000 to The Company for the production of 20,000 pulleys. In June 2011, CT Drives contends, AIM suddenly announced to CT Drives that it would no longer purchase alleged licenses from The Company. CT Drives alleges that it subsequently discovered that AIM and Mr. Cali had agreed, between themselves and Conntechnical and Positork Distributing, Inc. ("Positork"), to use the alleged technology and trade secrets of CT Drives to manufacture and sell the CT Drives product without payment of license fees or royalties and without the permission and consent of CT Drives. CT Drives further contends that AIM and Mr. Cali's actions abruptly curtailed the company's revenue and product development efforts. CT Drives and Cali do not agree and in fact disagree on many of these matters.

In November 2010, while receiving payments and fees from AIM and claiming to be negotiating in good faith with AIM, Cali contends that The Company secretly contacted and met with MPA – an AIM-developed customer responsible for over 80% of the volume of the product – to circumvent and usurp AIM's principal customer and by February 2011 AIM learned that the technology would not receive patent protection. Cali contends that AIM then informed The Company that AIM may not issue further payments or orders to CT Drives, and that in May 2011 The Company, without reasonable cause, sued AIM on a trademark cross-complaint. CT Drives and Cali do not agree and in fact disagree on many of these matters. Cali contends that in light of all these actions by The Company, AIM – predictably, in Cali's view -- made a business decision in June 2011 to permanently cease working with The Company and Higashi and AIM independently decided to produce active pulleys using its own technology and without, to its knowledge, infringement of any issued or pending patent. CT Drives and Cali do not agree and in fact disagree on many of these matters.

On March 21, 2011 Positork filed a lawsuit against The Company in the United States District Court alleging, in part, trademark and copyright infringement. The Company filed answers to the lawsuit denying the material obligations and a Cross Claim against AIM for indemnity against AIM.

Debtor believes that any recovery against the Debtor would be subject to Debtor's bankruptcy plan and would not materially impact Debtor's bankruptcy plan. Debtor believes that any recovery by the Debtor would belong to the Debtor. At this time Debtor does not know whether Positork will continue litigating the matter against The Company and anticipates any litigation of this matter will be through the claims objection process as Positork submitted a proof of claim. CT Drives and Cali do not agree and in fact disagree on many of these matters.

Debtor, as indicated in Schedule B, believes it has claims against AIM, Connard Cali, Conntechnical, and potentially others for violating its pending patents, breach of non-disclosure agreements, breach of fiduciary duty, interference with contract, and breach of contract. Debtor previously valued these claims at $500,000. Debtor understands that AIM, Connard Cali, Conntechnical, and other potential parties dispute and/or deny such claims exists. At this time Debtor has not commenced litigation on these claims, does not anticipate commencing litigation, and anticipates that such claims will be asserted as offsets/set-off and/or defenses to claims asserted against the Debtor. Any recovery in favor of the Debtor would belong to the Debtor. CT Drives and Cali do not agree and in fact disagree on many of these matters.

In May 2011, additional funds were solicited from investors through issuance of Secured Convertible Notes to support The Company's continued product development. These efforts proved insufficient and put the Company in a position where it could not timely meet its current obligations. In March 2011, the Company obtained approximately $301,768.42 in investment money from existing investors in EPX, Inc. (another Higashi company) in exchange for equity interests in Debtor. According to Conntechnical's review of the Company's books and records, the disposition of these funds is not accounted for in the Company's books and records, but most of the funds were paid over to Higashi and/or other entities controlled by Higashi. Shortly thereafter, in May 2011, additional funds in the amount of approximately $155,000 were solicited and obtained from essentially the same group of investors through issuance of Secured Convertible Notes to the support the Company's continued product development. These efforts provided insufficient and put the Company in a position where it could not timely meet its current obligations. Approximately two-thirds of the investors in these two groups were relatives of, or outside professionals employed by, Higashi and his

family. In addition, most of the investors in these two groups were equity holders in EPX, Inc.

Debtor has paid rent and bought supplies for ES Designs, a subsidiary in which Debtor owned a 45 percent interest. However, Debtor has written off $64,473 with regard to its investment in ES Designs.

Debtor has incurred cumulative net losses of more than $1,733,000 in the approximately four years of its existence. Debtor's gross sales during this period total approximately $850,000.

Debtor's financial books and records consist of a computerized QuickBooks file, entries in which can be, and, according to Conntechnical, have been, changed retroactively. Although the QuickBooks file lists, among other things, Debtor's revenues, expenses, transfers, and other business transactions, Debtor does not retain any "hard copy" documents against which the accuracy of the QuickBook entries, or the existence or details of any transaction, can be verified. Debtor, in fact, does not have any paper records at all. For example, Debtor has not retained any bank statements, cancelled checks, purchase orders, invoices, statements, shipping documents, or payroll records.

On November 1, 2011, CT Drives filed its Chapter 11 petition.

Since its petition filing, CT Drives has reorganized its business operations, has secured purchase orders, and engaging other potential customers. The Company believes that its best opportunity to generate funds to implement this Plan is to complete product development and secure a licensing agreement with a supplier of Original Equipment ("OE") for use of its product technology. The Company has been working jointly with several such suppliers in the design and testing over the course of the last year. While The Company's product has proven to be satisfactory for a segment of the automotive after market sales market, additional development is necessary to meet the additional requirements of the OE market.

Conntechnical, but not necessarily the Debtor, contends "In addition, it has become even more unlikely that Debtor will be able to secure OE business away from Litens Canada as originally intended. The Gates Corporation has developed its own decoupler pulley design, validated it, and earned OE decoupler business from at least General Motors. OE's now have highly capable supply alternative to Liten Canada, not only for a full overrun decoupler pulley, but also as a known one-stop design and supply for the full breadth of FEAD (front Engine Accessory Drive) systems (e.g.

decoupler pulley, belt, tensioner, etc.) It should also be noted that Debtor's pulley requires specially tooled bodies and shafts, as well as other specialty components and bearing sizes. These components must be custom tooled, custom manufactured, and then imported from Asia in order to be at all competitive. Debtor does not currently appear to have on hand any of his inventory, or timely orders for same, to support any substantive aftermarket supply. If Debtor ordered these parts today, they would not be delivered in production quantities for at least six months."

While The Company may pursue after market sales through the OE market the Plan does not anticipate or require such sales. Conntechnical, but not necessarily the Debtor, submits "Indeed, "the largest aftermarket customer" requires a minimum 60-day terms to pay fro product. At this time, it is unclear how the Company could carry $192,000 in open receivables (6,000 pulleys/month x 2 months x $16/pulley). Few if any suppliers will ship Debtor this product on open terms, so the payment terms are in advance; therefore, Debtor needs at least another 30 days' worth if material on hand for assembly; i.e., there is at least another $66,000 in capital needed ($11/pulley x 6,000 pcs.). In short, Debtor will require well in excess of $250,000 in capital, not including the capital necessary to cover assembly costs, overhead, and salaries. It is not yet known whether sufficient capital will be available, or when."

Debtor now focuses its business on product development and licensing its technology to others. As discussed hereinafter, post petition Debtor has issued unsecured convertible notes to several potential investors, secured related commitments, intends to secure court approval of such, intends to use such funds to address operational expenses and believes that this Plan will permit it to repay its creditors.

## DESCRIPTION OF PLAN

The following description of the Plan is a summary only – all holders of claims and interests against the Debtors in this case should carefully read the actual Plan of Reorganization which accompanies this Disclosure Statement. The significant substantive premises are:

Payments to Creditors: Payments to secured and unsecured creditors under Debtors' plan will be as follows:

Payments to Secured/Administrative Creditors -- There are 2 secured/administrative

creditor classes:

*CLASS 1a: Secured Convertible Note Claims.* Class 1a is impaired under this Plan. Secured creditors consist of holders of Secured Convertible Notes secured by The Company's assets. Debtor's Schedule D lists fifty-one secured creditors holding secured claims totaling $155,553.79. Class 1a claimants will receive no cash payments and will receive a proportionate equity unit ownership in the reorganized company proportionate to their current percentage of the secured debt as outlined in Debtor's Schedule D-Creditors Holding Secured Claims (Docket#15-2) such that Class 1a secured creditors will initially own 100% of the equity of the reorganized company and each dollar of secured debt will be converted into a dollar of equity in the reorganized company.

Class 1a secured creditors' percentage ownership of the reorganized company is subject to reduction following an issuance of equity interests to management personnel and the issuance of convertible unsecured promissory notes. Management, namely Frank Fitz, George Hampton, and Wayne Higashi, have worked post-petition for the Debtor without payment and are owed a total of approximately $78,000 (Frank Fitz 34.78%, George Hampton 20.00%, and Wayne Higashi 45.71% of this total) for services rendered from November 1, 2011 through April 30, 2012 and, at the discretion of the reorganized company, will receive a proportionate equity interest in the reorganized company such that a dollar of unpaid post-petition compensation will be converted into a dollar of equity in the reorganized company. Therefore, upon issuance of equity to management Class 1a secured creditors' interest will be diluted from 100% of the equity of the reorganized company to approximately 66.60% ($155,553.79/$233,553.79).

In addition, Debtor has offered various investors convertible unsecured promissory notes totaling $108,000, has received related commitments totaling $54,000, and will move the court for approval of this post-petition unsecured debt. These convertible unsecured promissory notes are convertible into equity in the reorganized company on the same basic terms as the Class 1a secured creditors' debt and management's unpaid compensation such that if the unsecured creditors elect each dollar advanced pursuant to these convertible unsecured promissory notes would be converted into a dollar of equity in the reorganized company. Therefore, upon issuance of equity pursuant to the convertible unsecured promissory notes Class 1a secured creditors' interest could be diluted from

100% of the equity of the reorganized company to approximately 45.54% ($155,553.79/$341,553.79). Conntechnical, but not necessarily the Debtor, contends "Further, because approximately two-thirds of the Class 1a creditors are compromised of Higashi family members, other insiders, and attorneys and accountants of Higashi, the interest of the non-insider secured creditors could be diluted to only 15%. Because most of the Class 1a secured creditors are current equity holders whose existing equity interests are to be cancelled under the proposed Plan, the issuance of new equity shares after plan confirmation may not significantly affect or change the percentage interests each of such creditors currently holds. Because the Plan provides for management to obtain additional equity upon Plan confirmation, the net effect of the Plan on most of the Class 1a creditors will be to simply dilute their interests by increasing the percentage of shares held by management. Further, a contention has been made by Conntechnical Industries., Inc., the largest unsecured creditor in this case, that the security interests purportedly granted to the Class 1a secured creditors should be disregarded, subordinated, or recharacterized as equity interests; and that therefore, no payment or equity should be given to any of the Class 1a creditors unless and until the unsecured creditors' class or classes have been paid in full. Finally, it should be noted that just before the Company granted the alleged security interests to the Class 1a creditors, the Company granted a security interest in all its assets to Higashi's wife, Rose A. Higashi, and Thomas L. Bahrick, the attorney for Highashi's entities."

*CLASS* 1b: Class 1b has been omitted.

*CLASS* 1c: *Administrative Claims of The Drucker Group*. Class 1c is impaired under this Plan. Class 1c consists of the Administrative Claims of The Drucker Group which includes post-petition unsecured convertible notes of approximately $4,500.

Payments to Unsecured Creditors -- All unsecured creditors are impaired under this Plan. Unsecured creditors are divided into 2 separate classes, based on their varying rights and claims in this case and as set forth in Debtor's Schedule F. Class 3a general unsecured creditors consist of all trade creditors, including Barry N. Young, Catliz Enterprises, International Technology Licensing Mgt. Co., Law Office of Michael G. Ackerman, RJS Machine Parts, and Thomas L. Bahrick. Class 3b general unsecured creditors consist of non-trade creditors, including Conntechnical, Inc, dba

Perfect Fit Manufacturing, and Positork Distributing, Inc., whose non-trade creditor claims are based on an unsecured promissory notes and a litigation claim respectively. Connard Cali is not included in this list as Debtor does not consider him a creditor, he is not scheduled as a creditor, and did not submit a timely proof of claim.

*CLASS 3a: General Unsecured Claims.* Claims in Class 3a are impaired under the Plan. Each Class 3a claimant will receive a series of twenty four (24) payments totaling eight percent (8%) of its allowed claim, paid over a period of twenty four (24) months commencing upon the Effective Date or on the last day of the first full calendar quarter after the Effective Date at the discretion and reasonable business judgment of the Reorganized Debtor. Promptly upon the Effective Date or at the end of the first full calendar quarter following the Effective Date, the Debtor will make a pro rata distribution to all Class 3a creditors, continuing until each creditor has been paid 8% of its allowed claim. Should a Class 3a claim be objected to by Debtor or any other party with standing to object, the amount of money which would otherwise have been paid to such claimant will be retained by Debtor in the impound account until the Bankruptcy Court makes a final determination of allowability of such claim.

Debtor estimates that allowable Class 3a claims will total approximately $20,504.81.

*CLASS 3b: General Unsecured Claims.* Claims in Class 3b are impaired under the Plan. Each Class 3b claimant will receive a series of twenty four (24) payments totaling eight percent (8%) of its allowed claim, paid over a period of twenty four (24) months commencing upon the Effective Date or on the last day of the first full calendar quarter after the Effective Date at the discretion and reasonable business judgment of the Reorganized Debtor. Promptly upon the Effective Date or at the end of the first full calendar quarter following the Effective Date, the Debtor will make a pro rata distribution from such impounded funds to all Class 3b creditors, continuing until each creditor has been paid 8% of its allowed claim. Should a Class 3b claim be objected to by Debtor or any other party with standing to object, the amount of money which would otherwise have been paid to such claimant will be retained by Debtor in the impound account until the Bankruptcy Court makes a final determination of allowability of such claim. On March 6, 2012, Positork filed a Proof of Claim (2-1 and 2-2) for an amount to be determined. On March 6, 2012, Conntechnical Industries, Inc. filed a

Proof of Claim (3-1) for an amount of $590,027.06.

Debtor estimates that allowable Class 3b claims will total approximately $0.00.

CLASS 4: Equity Security Holders. Class 4 is impaired under this Plan. Class 4 equity holders are identified by name, number of units held, and ownership percentage in Debtor's List of Equity Holders (Docket#12). All current membership interests in Debtor will be canceled under this Plan as of its Effective Date.

<u>Treatment of Other Claims and Interests</u> -- Other claims and interests are subject to the following classifications and treatment under the Plan:

<u>Classified Priority Claims</u>: Holders of Class 2 Priority Claims are not impaired under the Plan and will receive, on the Effective Date, cash equal to the allowed amount of their claims unless they elect other treatment. Debtors are unaware of any Class 2 priority claims.

<u>Unclassified Administrative Claims</u>: Unclassified Allowed Administrative Claims entitled to priority under Code §507(a)(1) will receive cash in the amount of such claims on the Effective Date, unless such claimants elect other treatment. Known administrative claims are as follows:

*Law Office of Campeau Goodsell Smith.* Debtor retained the Law Offices of Campeau Goodsell Smith as its bankruptcy counsel and paid a retainer of $25,000 to that firm. There is no sum presently owing to said attorneys. At this time the Debtor does not anticipate the sum owed to said law firm will exceed a total of $40,000. Fees owed to said law firm can only be paid after Court approval, and said law firm will accept payments over time if necessary.

<u>Unclassified Tax Claims</u>: Unclassified Allowed Tax Claims entitled to priority under Code §507(a)(7) will be paid in cash in quarterly installments commencing on the next quarterly payment date after the Effective Date sufficient to pay such Claims with interest in full over a period not exceeding five years from the petition date. Unless otherwise agreed by the Reorganized Debtor and the claim holder, deferred payment on account of each such priority tax claim shall be made in equal quarterly installments commencing on the last day of the first full calendar quarter after the Effective Date. Such monthly installments shall include interest at the rates regularly prescribed by the taxing authorities. On November 30, 2011, the Internal Revenue Service filed a Proof of Claim

(Claim 1-1) asserting tax due of $100.00 for the tax period ending 12/31/11.

## MEANS FOR IMPLEMENTING THE PLAN

The funds to implement the Plan will come from Debtor's business operations and convertible unsecured debt.

<u>Debtor's Payment Feasibility Analysis</u>.  As set forth above, the funds necessary to implement the Plan will be derived from Debtor's on-going business operations and/or the issuance of post-petition unsecured debt. Exhibit 1 to this Disclosure Statement is a historical summary of Debtor's business operations for calendar year 2011, which Debtor believes to be representative of its current and on-going operations.  Exhibit 2 to this Disclosure Statement is a projection of Debtor's expected business operations for calendar years 2012, 2013 and 2014 – including anticipated payment schedules.  Exhibit 1 to this Disclosure Statement is a balance sheet for Debtor as of September 30, 2011, which Debtor believes to be representative of its current and on-going operations. Exhibit 1 does not include a profit and loss statement although as set forth above, Debtor's cumulative net losses exceed $1,733,000. Exhibit 2 to the Disclosure Statement is a projection of Debtor's expected business operations for calendar years 2012, 2013 and 2014- including anticipated payment schedules. Exhibit 2 is based on Highashi's opinion, i.e., it was not prepared through reference to any specific documents, statistics, or historical performance, nor through reference to any industry publications or information, nor though consultation with any financial or industry experts.

In addition, Debtor recently completed shipments to one of North America's largest re-manufacturers of starters and alternators, anticipates additional and greater orders by mid-July 2012, received a formal request for quotation (RFQ) from one of the world's largest motor-vehicle manufacturers, and initiated substantive original equipment (OE) licensing discussions with one of the world's manufacturers for exclusive manufacturing rights, and thus royalty payments to the Debtor. In addition, Debtor received a RFQ from a particular one of the world's largest motor-vehicle manufacturers subject to satisfaction of a technical qualification. Conntechnical, but not necessarily the Debtor, submits "However, Debtor cautions that manufacturers, particularly large ones, frequently send RFQs to multiple recipients, and that the receipt of an RFQ in and of itself is not a guarantee of any future business."

The recently completed shipments resulted in sales and shipments of 1,000 pulleys at $16/per pulley and Debtor anticipates additional orders at the rate of approximately 6,000/month in the next few months. Debtor cautions that the cost of goods sold for each pulley (without taking overhead into account) exceeded $19; Conntechnical submits that, as a result, Debtor has lost and will likely continue to lose money on each pulley sold."

Based on the foregoing analysis, Debtor believes that the reorganized debtor will make all anticipated creditor payments.

<u>Officers/Members</u>. On the Effective Date, all outstanding membership interests in CT Drives will be cancelled and 100,000 new CT Drives membership interests will be issued and tendered to Class 1a Secured Creditors in resolution of their Class 1a claims. Wayne K. Higashi will continue to manage day-to-day operations.

<u>Payment Mechanism</u>. Debtor or its counsel, at Debtor's election, will act as the disbursing agent under this Plan, without bond. The funds to be distributed under the Plan shall be under management and control of the disbursing agent. At each of the anticipated funds distribution events, the disbursing agent shall calculate the distribution due to the holders of allowed claims, shall round all amounts for distributions to the nearest whole dollar amount, and shall forward such funds distributions to the last known address of claimant. Unclaimed property will be placed in the disbursing agent's separate blocked account for benefit of the holders of allowed claims entitled thereto under the terms of the Plan. Unclaimed property shall be held solely for the benefit of the holders of allowed claims that have failed to claim such property. Upon presentation of proper proof by a claimant of entitlement to unclaimed property, unclaimed property due to the claimant shall be released and paid to such claimant. Notwithstanding the foregoing, six months after a distribution becomes unclaimed property, claimants shall cease to be entitled to unclaimed property in which they previously had an interest and such unclaimed property shall become the reorganized debtor's property.

On the Effective Date, all property of the estate shall vest in the reorganized debtor pursuant to Code sec. 1141(b), provided that the vesting of said property shall be without prejudice and shall not act as a bar to a post-Confirmation motion to convert this case to one under Chapter 7 by the

United States Trustee or any other party in interest upon appropriate grounds, and upon granting of such motion, the Plan shall terminate and the Chapter 7 estate shall consist of all remaining property of the Chapter 11 estate not already administered. Such remaining property shall be administered by the Chapter 7 trustee as prescribed in Chapter 7 of the Bankruptcy Code. Debtor reserves all rights to oppose any such motion.

Except as provided in the Confirmation Order, on the Effective Date the Debtor will be vested with all of the property of the Estate free and clear of all claims, liens, charges and other interests of creditors arising prior to the Petition date, and will continue to conduct its affairs and may obtain credit, incur debt, grant security interests and liens, and otherwise acquire and dispose of assets.

## **TAX IMPLICATIONS OF THE PLAN**

The tax implications of the transactions described under this Plan are set forth below. This discussion is for informational purposes only, however, and does not represent an opinion of counsel; further, due to lack of applicable legal precedent, the possibility of changes in the law and differences in the nature of individual creditors' claims and methods of accounting, the tax consequences described herein are subject to significant uncertainties. *EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR WITH REGARD TO THE TAX CONSEQUENCES OF THE PLAN.*

Under the Internal Revenue Code of 1986 (the "Tax Code"), a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the taxable year, except to the extent payment of such indebtedness would have resulted in a tax deduction. Tax Code §108 provides however that when a discharge of indebtedness occurs in a case under the Bankruptcy Code, gross income does not include any amount that would otherwise be included by reason of the discharge of indebtedness. Instead, a taxpayer is required to reduce certain end-of-year tax attributes (e.g., net operating loss) for federal income tax purposes by the amount of discharge of indebtedness income it is allowed to exclude.

With respect to the anticipated income tax consequences for the debtors under the Plan, holders of non-classified claims and holders of priority wage claims (if any) generally will be paid on the Effective Date or subsequently upon their election. The allowed amount (if any) of secured

claimants' secured claims will be paid upon liquidation of their underlying collateral. Claims that are paid in full should not result in discharge of indebtedness income. In contrast, satisfaction of the unsecured claims may or may not result in a discharge of indebtedness. Because the discharge will occur pursuant to the Plan, Debtors will not be required to include discharge of indebtedness income in their taxable income; however, any tax attributes such as net operating losses will be reduced by the excess, if any, of the amount of the discharge of indebtedness over the fair market value of other property transferred in satisfaction of such claims. As of the date of this Disclosure Statement, Debtor has been unable to determine the amount of any allowable accrued net operating losses.

With respect to income tax consequences for individual creditors under the Plan, such consequences will depend upon, among other things, consideration to be received by the creditor, whether the creditor reports income using the accrual or cash method, and on whether the creditor has taken a bad debt or worthless security deduction with respect to its claim. Holders of unsecured claims may not ultimately be completely satisfied under the Plan and may therefore recognize gain or loss equal to the difference between the ultimate sum of payments received and the adjusted tax basis of their underlying claim(s). The character of any gain or loss as capital or ordinary gain or loss will depend upon a number of factors; each creditor recognizing gain or loss pursuant to the Plan should consult his or her tax advisor as to applicability of these factors to its situation. Creditors will recognize ordinary income to the extent that they receive any cash or property that is attributable to accrued but unpaid interest that has not already been included for federal income tax purposes in such creditor's taxable income. A creditor whose claim includes accrued interest and who receives consideration which is less than the amount of its claim must allocate such consideration between principal and interest for income tax purposes. In the event that the amount of cash and other property attributable to interest on a creditor's claim is less than the amount previously included as interest on the claim in the creditor's federal taxable income, the unpaid interest may be deducted, generally as a loss or as an adjustment to a reserve for bad debts. Since the Plan provides for principal-only reduction, no interest income should accrue to creditors under the Plan and Debtor should not be required to withhold any amounts otherwise required by law to be withheld from payments to certain claimants nor should any claimants be required to provide mandated tax

**THIRD AMENDED DISCLOSURE STATEMENT**
14
Case: 11-60198   Doc# 87   Filed: 06/25/12   Entered: 06/25/12 13:08:35   Page 14 of 18

information to Debtor as a condition of receiving distributions under the Plan. With respect to all distributions under the Plan, Debtor will comply with all applicable reporting requirements under the Tax Code.

At this time the Debtor is unaware of any adverse tax consequences to the Debtor as a result of Debtor's proposed plan.

## THE "BEST INTEREST" TEST AND THE LIQUIDATION ANALYSIS

Notwithstanding acceptance of the Plan by the requisite statutory majorities, in order to confirm the Plan the Bankruptcy Court must independently determine that the Plan is in the best interests of all impaired classes of Claims and Interests. The "best interest" test requires that the Plan provide to each member of each impaired Class a recovery that has a present value of at least equal to the present value of the distribution which such a member would receive if the debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code.

In performing this analysis, the Bankruptcy Court must first determine the dollar amount that would be generated from liquidation of Debtor's assets, add this amount to cash held by Debtors, then deduct the costs of liquidation. Under Chapter 7, liquidation costs would likely include the fees for a trustee, as well as those of counsel and other professionals retained by the trustee, and selling expenses. These claims would have to be paid in full before any payment to unsecured creditors. In addition, any unpaid obligations incurred by Debtor during its Chapter 11 case would have to be paid before any payment to unsecured creditors.

Debtor's immediate personal property is described in Debtor's Schedule B (Docket#36), includes cash ($915.78), accounts receivable ($9,600), and inventory and equipment ($4,648), and is of minimal value and would likely result in less than $10,000 net recovery if liquidated as the accounts receivable may be subject to collection costs and set off/offset and the inventory and equipment are subject to costs of sale. Debtor's other personal property, also described in Debtor's Schedule B (Docket #36), consists primarily of its intellectual property and claims against Mr. Cali, Conntechnical, Positork, and/or AIM. Debtor believes that without the continued support of the developers of this technology, namely Wayne K. Higashi, Frank Fitz, and George Hampton, and without further development of the product to satisfy the requirements of the OE market, the

technology is currently worth $100,000 or less. Debtor has not formally asserted claims against Mr. Cali, Conntechnical, Positork, and/or AIM, has not liquidated these claims, and, given the Debtor's priorities and economics, has thus far considered these claims as set offs against any claims against the Debtor and not affirmative claims.

Debtor valued its immediate personal property by using figures from its books and records, considering purchase prices, considering potential resale values, and using the experience of management. Debtor valued its other assets, namely its intellectual property by using management's experience and knowledge in the industry and its claims by evaluating and estimating the damages caused to the Debtor by the actions of others as set forth above. Debtor has not obtained any appraisal or valuation of any of its assets, including patents or other intellectual property.

As set forth in Debtor's Schedule D-Creditors Holding Secured Claims the Debtor owed, at the commencement of the case, at least $155,553.79 to its secured creditors. Debtor also submits that because the majority of its assets are technology, specifically patents pending, and require further development, if its assets were liquidated there would not be a recovery sufficient to satisfy the obligations to the secured creditors. The cost of sale and collection would further reduce the recovery to secured creditors. Liquidation would not provide any recovery for unsecured creditors.

Conntechnical, but not necessarily the Debtor, submits "The assets of the Debtor include potential claims against Higashi, his entities, and insiders. Among other things: Although Higashi's company International Technology Licensing Management Co. (ITLMC"), has billed Debtor only $187,500 for alleged fees, Debtor has paid at least $608,653.75 to ITLMC for alleged management services, and approximately $300,000 more to Higashi and others for "consulting". Debtor has recorded the payment of $16,000 to EPX, Inc., another Higashi entity, as "management fees", although there is no apparent basis for such payments. Debtor has also transferred money to other Highashi-controlled entities. The total of these outlays greatly exceeds all gross sales revenue obtained by Debtor from inception. A Chapter 7 trustee might seek to recover these and other payments. Debtor has not made any estimate of the value of these or any other potentially voidable transfers; Debtor's belief that liquidation would not provide any recovery for unsecured creditors does not take into account any money that may come back into Debtor's estate in the form of

recovery of any or all of these payments."

On this basis and after payment of the costs of a Chapter 7 liquidation, including Chapter 7 trustee fees, related counsel fees, and selling expenses, little, if anything, is likely to remain for payment to secured creditors, assuming the secured creditors consented to a sale by the Chapter 7 trustee, and nothing for unsecured creditors. Debtor believes that the net proceeds of liquidation of its assets would be substantially less than the amounts to be paid under this Plan.

## EFFECT OF CONFIRMATION

Upon Confirmation, all property of the Estate, including all causes of action, will revest in Debtor free of all Claims and Interests of creditors except for obligations that are created or preserved under the Plan and that are secured by assets of the Estate. Except as expressly limited in this Plan, all Debtor's claims, defenses and causes of action may be pursued after Confirmation.

## RETENTION OF JURISDICTION

After Confirmation, the Plan provides that the Bankruptcy Court retains jurisdiction to enforce the provisions, purposes, and intent of the Plan including matters that relate to: (1) any allowance, disallowance or settlement of claims and objections thereto; (2) any assumption, assignment or rejection of any executory contract or unexpired lease; (3) any rights, title or interests of Debtors or their Estate in any property; (4) any right, power, action or duty of Debtors or any Committee under this Plan; (5) any determination or estimation necessary or appropriate under Code §505; (6) any requests for payment of claims entitled to priority under Code §505(a); (7) resolution of controversies and disputes arising out of interpretation of this Plan; (8) implementation of the provisions of this Plan; (9) modification of the Plan pursuant to Code §1127; (10) adjudication of any causes of action, including avoiding power actions brought by Debtors; (11) such other matters as may be provided under the Bankruptcy Code, the Plan, the Confirmation Order, or other applicable law; and (12) entry of a Final Decree closing this case. In addition, Debtors will file post-Confirmation reports with the Court in such format as may be acceptable to the Court, and will pay quarterly U. S. Trustee fees until entry of a Final Decree.

A quarterly fee for the Estate will be paid by Debtor to the United States Trustee for each quarter (including any fraction thereof) until this case is converted, dismissed or closed pursuant to a

**THIRD AMENDED DISCLOSURE STATEMENT** 17
Case: 11-60198   Doc# 87   Filed: 06/25/12   Entered: 06/25/12 13:08:35   Page 17 of 18

final decree, pursuant to 11 U.S.C. sec. 1930(a)(6).

Not later than 30 days after the end of each calendar quarter which ends after the Effective Date, Debtor shall file and serve upon the United States Trustee a quarterly post-Confirmation status report in substantially the form provided by the Office of the United States Trustee. Further reports shall be filed 30 days after the end of every calendar quarter thereafter until entry of a final decree, unless otherwise ordered by the Court.

### **DISCLAIMER**

*THE ONLY REPRESENTATIONS AUTHORIZED BY DEBTOR CONCERNING THE VALUE OF ASSETS, THE EXTENT OF LIABILITIES OR ANY OTHER FACTS MATERIAL TO DEBTOR'S PLAN ARE THOSE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL STATEMENTS AND REPRESENTATIONS IN THIS DISCLOSURE STATEMENT, INCLUDING THOSE RELATING TO FINANCIAL, BUSINESS AND ACCOUNTING DATA, ARE DRAWN FROM DEBTOR'S BOOKS AND RECORDS AND, EXCEPT AS OTHERWISE SPECIFIED, IS UNAUDITED. DEBTOR BELIEVES THAT SUCH INFORMATION IS CORRECT AND FAIRLY PRESENTED, BUT CANNOT WARRANT THAT THE INFORMATION HEREIN IS ENTIRELY FREE FROM INACCURACY.*

DATED: June 25, 2012        CAMPEAU GOODSELL SMITH
          /s/ William J. Healy
          William J. Healy